UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| PAMELA ARCHER,<br><br>                    Plaintiff,<br><br>         v.<br><br>UNUM LIFE INSURANCE COMPANY OF AMERICA,<br><br>                    Defendant. | CASE NO. 2:23-cv-01128-LK<br><br>ORDER DENYING PLAINTIFF'S MOTION FOR JUDGMENT ON THE RECORD AND GRANTING DEFENDANT'S CROSS-MOTION FOR PARTIAL JUDGMENT ON THE RECORD |

This matter comes before the Court on Plaintiff Pamela Archer's motion for judgment on the record pursuant to Federal Rule of Civil Procedure 52, Dkt. No. 16, and Defendant Unum Life Insurance Company of America's opposition and cross-motion for partial judgment on the record, Dkt. No. 17.[1] Archer alleges that Unum wrongfully terminated her claim for ongoing long-term disability ("LTD") benefits after learning that she resided in Mexico for more than six months during a 12-month period, in violation of Unum's policy (the "Policy"). Dkt. No. 1 at 3–4. Archer concedes that she failed to strictly comply with the Policy's international residency provision, but

---

[1] Unum does not seek judgment on all of its counterclaims, so its motion is really one for partial judgment on the record.

claims that she is entitled to a judgment against Unum under Section 502(a)(1)(B) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), due to Unum's failure to continue her disability insurance benefits under the circumstances—namely, the travel challenges she faced during the COVID-19 pandemic. *Id.* at 7–8; *see* Dkt. No. 16 at 12–16. She also claims that she is entitled to equitable relief under Section 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), based on Unum's breach of its fiduciary duties. Dkt. No. 1 at 8–9; Dkt. No. 16 at 16–19. Unum contends that the Policy must be enforced as written, and that based on the plain language of the international residency clause and the undisputed facts of this case, partial judgment should be entered in its favor. Dkt. No. 17 at 3–5, 9–10.

For the reasons set forth below, the Court denies Archer's motion, Dkt. No. 16, and grants Unum's motion, Dkt. No. 17. The Court further directs the parties to meet and confer and submit a proposed briefing schedule regarding Unum's counterclaim to recover its alleged overpayment. *See* Dkt. No. 6 at 10–12; Dkt. No. 17 at 3 n.1, 10; Dkt. No. 20 at 1 n.1.

## I.    STANDARD OF REVIEW

The district court reviews a decision to deny benefits under an ERISA plan de novo "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Gatti v. Reliance Standard Life Ins. Co.*, 415 F.3d 978, 981 (9th Cir. 2005) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). "When the plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits, that determination is reviewed for abuse of discretion." *Id.* "[T]he default is that the administrator has no discretion, and the administrator has to show that the plan gives it discretionary authority in order to get any judicial deference to its decision." *Kearney v. Standard Ins. Co.,* 175 F.3d 1084, 1089 (9th Cir. 1999) (en banc).

1    In this case, while the relevant documents appear to grant Unum "discretionary authority

2    to make benefit determinations under the Plan," Dkt. No. 15 at 312 (AR 312), Archer asserts—

3    and Unum does not dispute—that de novo review applies, Dkt. No. 16 at 10–11; Dkt. No. 18 at 2;

4    *see generally* Dkt. Nos. 17, 20. Moreover, since 2009, discretionary clauses like the one at issue

5    here have been deemed unenforceable under Washington law. *See* Wash. Admin. Code § 284-96-

6    012; *Pearson v. Aetna Life Ins. Co.*, No. C15-0245-JLR, 2016 WL 2745299, at *4 n.9 (W.D. Wash.

7    May 10, 2016); *Treves v. Union Sec. Ins. Co., LLC*, No. C12-1337-RAJ, 2014 WL 325149, at *2

8    (W.D. Wash. Jan. 29, 2014); *see also N.C. v. Premera Blue Cross*, 667 F. Supp. 3d 1102, 1106–

9    07 (W.D. Wash. 2023) (noting that "several courts have held that [this] regulation voiding

10   discretionary clauses in disability insurance policies is not preempted by ERISA, making de novo

11   review mandatory for such policies"), *aff'd*, No. 23-35381, 2024 WL 2862586 (9th Cir. June 6,

12   2024).[2] For these reasons, the Court finds that de novo review is appropriate.

13       On de novo review, the Court conducts a bench trial on the record, and makes findings of

14   fact and conclusions of law based on that record. *See Walker v. Am. Home Shield Long Term*

15   *Disability Plan*, 180 F.3d 1065, 1069 (9th Cir. 1999) (stating that de novo review applies to the

16   plan administrator's factual findings as well as plan interpretation). A bench trial may "consist[]

17   of no more than the trial judge rereading [the administrative record.]" *Kearney v. Standard Ins.*

18   *Co.*, 175 F.3d 1084, 1095 (9th Cir. 1999) (en banc). Accordingly, the Court issues these findings

19   of fact and conclusions of law based on a de novo review of the record.

20

21

---

22   [2] Although the Policy went into effect in 2007 and the Washington regulation prohibiting discretionary clauses went into effect in 2009, Unum issued an amended version of the Policy in 2012, Dkt. No. 15 at 256–57 (AR 256–257), making the regulation applicable here, *see, e.g.*, *Rustad-Link v. Providence Health & Servs.*, 306 F. Supp. 3d 1224, 1233–35 (D. Mont. 2018) (collecting cases from this district). In any event, the Court notes that it would reach the same outcome in this case under an abuse of discretion standard. *See, e.g.*, *Gilliam v. Nev. Power Co.*, 488 F.3d 1189, 1194 (9th Cir. 2007).

ORDER DENYING PLAINTIFF'S MOTION FOR JUDGMENT ON THE RECORD AND GRANTING DEFENDANT'S CROSS-MOTION FOR PARTIAL JUDGMENT ON THE RECORD - 3

## II.    FINDINGS OF FACT

Applying de novo review to the administrative record, the Court makes the following findings of fact.[3]

### A.    Archer's Employment and Unum's Initial Award of LTD Benefits

1.    Archer worked for many years as a nurse, including in the U.S. Army during the first Gulf War. *See* Dkt. No. 15-1 at 202–04, 493, 529, 661 (AR 1202–04, 1493, 1529, 1661). Archer suffers from post-traumatic stress disorder ("PTSD") and several chronic orthopedic and medical conditions which impair her functioning. *See id.* at 474 (AR 1474).

2.    Due to her combination of ailments, Archer stopped working in October 2012. *See* Dkt. No. 15 at 5 (AR 5); Dkt. No. 15-1 at 135 (AR 1135).

3.    Unum issued Group Insurance Policy No. 138177 002 to Archer's then-employer, Providence Health & Services, as part of Providence's ERISA employee welfare benefits plan (the "Plan"). *See* Dkt. No. 15 at 257, 259, 306 (AR 257, 259, 306).

4.    Based on Archer's conditions, Unum, as the Plan administrator, approved her claim for LTD benefits in August 2013. *See* Dkt. No. 15 at 363–69 (AR 363–69).

5.    Barring a change in her status, Archer remained eligible for LTD benefits until September 2026. Dkt. No. 15 at 855 (AR 855); *see also* Dkt. No. 15-1 at 32 (AR 1032).

### B.    The Terms of Coverage Provided Under the Policy

6.    As relevant here, the Policy included the following provision:

***WHEN WILL PAYMENTS STOP?***

We will stop sending you payments and your claim will end on the earliest of the following:

---

[3] To the extent any of the Court's findings of fact may be deemed conclusions of law, they shall also be considered conclusions of law. Similarly, to the extent any of the Court's conclusions of law may be deemed findings of fact, they shall also be considered findings of fact.

1  . . . after 12 months of payments if you are considered to reside outside the United
2  States or Canada. You will be considered to reside outside these countries when
   you have been outside the United States or Canada for a total period of 6 months
3  or more during any 12 consecutive months of benefits[.]

4  Dkt. No. 15 at 293 (AR 293); Dkt. No. 15-3 at 38 (LTD Policy at 38).

5          7.      In addition, the Policy stated that "Unum has the right to recover any overpayments

6  due to," among other things, "any error Unum makes in processing a claim[.]" Dkt. No. 15 at 271

7  (AR 271); Dkt. No. 15-3 at 16 (LTD Policy at 16).

   **C.     Archer's Place of Residence and Unum's Subsequent Denial**

8          8.      Archer is a United States citizen. *See, e.g.*, Dkt. No. 15-2 at 421 (AR 2421)

9  (photocopy of Archer's U.S. passport).

10         9.      In a form dated October 6, 2020, under a heading labeled "Information about your

11 Condition," Archer wrote to Unum:

12     I am currently living in Mexico as the climate is better for my physical health. My
       plan was to stay in Mexico 8 months a year and go to Oregon 4 months a year. I
13     also planned on going to the Phoenix VA Medical Center quarterly for [h]ealth care
       and to get RX filled. I went to Phoenix in January 2020 to get this set up and had
14     appts with a new GP and Psychiatrist set for 4/2020. I was not able to go in April
       due to COVID-19.
15

16     I have been in Mexico since 10/2019 except for [a] 5 day trip to Phoenix in 1/2020.
       My plan for health care in the USA was cancelled due to COVID-19. I have since
17     found a GP here in Mexico and currently get my medications here also. When it is
       safe for me to travel again I will reinstate my quarterly appts with the Phoenix VA
18     medical Center. I have been notified by the VA that the clinics are again re-opened
       but being high risk for COVID-19 I am not willing to go to the USA at [t]his time.
19     I will continue my health care here in Mexico. . . .

20 Dkt. No. 15-1 at 93, 98 (AR 1093, 1098); *see also* Dkt. No. 15-2 at 208, 311, 428 (AR 2208, 2311,

21 2428).

22         10.     In a letter dated March 4, 2022, Unum requested additional information from

23 Archer, highlighted the international residency provision and other Policy language, and advised

24

ORDER DENYING PLAINTIFF'S MOTION FOR JUDGMENT ON THE RECORD AND GRANTING
DEFENDANT'S CROSS-MOTION FOR PARTIAL JUDGMENT ON THE RECORD - 5

1  her that it was "in the process of evaluating [her] Long Term Disability claim to ensure [she]

2  continue[d] to remain eligible for benefits[.]" Dkt. No. 15-1 at 447–51 (AR 1447–51).

3      11.    When Archer failed to provide the requested information, Unum suspended her

4  benefits effective April 28, 2022. *Id.* at 684 (AR 1684).

5      12.    In June 2022, Unum informed Archer that her eligibility for benefits had ended in

6  April 2020 after six months of her living in Mexico. Dkt. No. 15-2 at 231–38, 300–06 (AR 2231–

7  38, 2300–06). Unum further notified Archer that its payment of benefits over a period when she

8  was no longer eligible, i.e., between April 20, 2020 and April 27, 2022, resulted in an overpayment

9  of $62,893.14 which Unum sought to recover. *Id.* at 323 (AR 2323).

10     13.    The claim file also contains a record of a call with Archer from 2022 in which an

11  Unum claims representative notes that they "explained about the out of country provision for 6

12  consecutive months." *Id.* at 208 (AR 2208).

13  **D.    Archer's Post-Termination Appeal**

14     14.    On June 21, 2022, Archer sent an email disputing Unum's letter from the same day

15  and indicating her intent to appeal. *Id.* at 311 (AR 2311).

16     15.    Unum construed this email as Archer's appeal and denied the appeal by letter dated

17  June 27, 2022. *Id.* at 327, 332, 334–39 (AR 2327, 2332, 2334–39).

18     16.    On May 6, 2023, Archer submitted another appeal with assistance of counsel,

19  providing further information concerning her travel dates and requesting that Unum waive the

20  international residency provision. *See id.* at 418–20 (AR 2418–20). Unum responded on May 10,

21  2023, stating that "no further appeal review [wa]s available" and denying Archer's request to

22  waive the relevant provision. *Id.* at 442 (AR 2442).

23     17.    Archer initiated the instant action on July 28, 2023. Dkt. No. 1.

24

1

### III.   CONCLUSIONS OF LAW

2          Based on the above findings of fact, the Court makes the following conclusions of law

3  regarding Archer's claim for denial of benefits and breach of fiduciary duty.

4  **A.    Jurisdiction and Venue**

5          1.        Archer's claims arise under ERISA, and the Court has jurisdiction over this case

6  under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331. Venue is proper under 29 U.S.C. § 1132(e)(2)

7  and 28 U.S.C. § 1391(b)(2).

8          2.        Unum concedes that Archer has exhausted her administrative appeal and that her

9  claim is ripe for judicial review. *See* Dkt. No. 1 at 2, 6; Dkt. No. 6 at 1, 2, 5.

10  **B.    Unum Lawfully Terminated Archer's Benefits**

11          3.        Under Section 502 of ERISA, a plan participant or beneficiary may commence an

12  action to recover benefits due under the terms of her plan, to enforce her rights under the terms of

13  her plan, or to clarify her rights to future benefits under the plan. 29 U.S.C. § 1132(a)(1)(B); *see*

14  *Aetna Health Inc. v. Davila*, 542 U.S. 200, 210 (2004); *Chappel v. Lab'y Corp. of Am.*, 232 F.3d

15  719, 724 (9th Cir. 2000).

16          4.        Once a plan is established, the plan administrator's duty is to see that such plan is

17  "maintained pursuant to [that] written instrument." *Heimeshoff v. Hartford Life & Accident Ins.*

18  *Co.*, 571 U.S. 99, 108 (2013) (quoting 29 U.S.C. § 1102(a)(1)); *see also Wit v. United Behav.*

19  *Health*, 79 F.4th 1068, 1087 (9th Cir. 2023) ("ERISA focuses on the written terms of the plan[.]"

20  (citation modified)). In light of the statute's reference to the "terms of the plan," Archer's "cause

21  of action for benefits is likewise bound up with the written instrument," and the Supreme Court

22  has "recognized the particular importance of enforcing plan terms as written in § 502(a)(1)(B)

23  claims." *Heimeshoff*, 571 U.S. at 108. "This focus on the written terms of the plan is the linchpin

24

of a system that is not so complex that administrative costs, or litigation expenses, unduly discourage employers from offering ERISA plans in the first place." *Id.* (citation modified).

5.    "[C]ourts construe ERISA plans, as they do other contracts, by looking to the terms of the plan as well as to other manifestations of the parties' intent." *US Airways, Inc. v. McCutchen*, 569 U.S. 88, 102 (2013) (citation modified); *see also Gilliam*, 488 F.3d at 1194 ("[T]erms in an ERISA plan should be interpreted in an ordinary and popular sense as would a person of average intelligence and experience," and "when disputes arise, courts should first look to explicit language of the agreement to determine, if possible, the clear intent of the parties" (citation modified)).

6.    Furthermore, under de novo review, the Court performs an "independent and thorough inspection" of the plan administrator's decision in order to determine whether the plan administrator correctly denied benefits. *Silver v. Exec. Car Leasing Long–Term Disability Plan*, 466 F.3d 727, 733 (9th Cir. 2006). In such cases, courts "simply proceed to evaluate whether the plan administrator correctly or incorrectly denied benefits." *Wolf v. Life Ins. Co. of N. Am.*, 46 F.4th 979, 984 (9th Cir. 2022) (citation modified).

7.    Here, the Policy's written terms unambiguously state that Unum would stop sending Archer payments and her claim would end if she remained outside the United States or Canada for "a *total* period of 6 months or more during any 12 consecutive months of benefits[.]" Dkt. No. 15 at 293 (AR 293) (emphasis added). In other words, the Policy required Archer to spend more than 50 percent of any 12-month period in the United States. Between October 2019 and April 2020, Archer resided in Mexico for a cumulative period of six months or more during a 12-month period. Dkt. No. 15-1 at 93 (AR 1093) ("I have been in Mexico since 10/2019 except for [a] 5 day trip to Phoenix in 1/2020."); Dkt. No. 15-2 at 428 (AR 2428) (copy of Archer's visa indicating that she arrived in Mexico on October 13, 2019); *id.* at 432 (AR 2432) (handwritten notes indicating that Archer traveled to Phoenix, Arizona from January 23, 2020 to January 28,

2020); *id.* at 301 (letter from Unum to Archer stating that she "indicated that [she] moved to Mexico as of October 13, 2019"); *see also* Dkt. No. 16 at 4 (Archer "began spending most of her time in Mexico as of October of 2019"); *id.* at 5 ("Archer provided this information to Unum on October 7, 2020, when she had already been out of the U.S. for over eight months."); *id.* at 7 ("Archer admits she was out of the U.S. from January 28, 2020 to February 20, 2021.").[4]

8.    Notwithstanding her clear violation of the Policy's terms, Archer argues that the international residency provision should be waived due to the barriers to travel that existed during the COVID-19 pandemic, such as flight cancellations and medical risks, as well as the fact that Unum reinstated LTD benefits for another allegedly similarly situated claimant. *See* Dkt. No. 16 at 12–16; Dkt. No. 18 at 2–14.

     (a)  <u>Archer Has Not Demonstrated that it was Impossible for Her to Comply with the International Residency Provision</u>

9.    Archer first contends that the international residency provision should be waived because it was "impossible" for her to comply with due to the travel restrictions brought about by the COVID-19 pandemic. *See* Dkt. No. 16 at 12–14.[5] Assuming without deciding that

---

[4] Archer misconstrues the plain language of the Policy, asserting that "[u]nder the terms of the plan, a claimant is allowed to remain in a foreign country essentially indefinitely, so long as they return to the U.S. at least once every six months." Dkt. No. 18 at 6; *see also* Dkt. No. 1 at 3 ("At all times prior to the onset of the COVID-19 pandemic, Plaintiff satisfied the Plan's international travel requirements, returning to the United States at least once every six months."). As Unum points out, "the provision says that individuals who are outside the United States or Canada for a total of 6 months in any given 12-month period are ineligible, not that claimants can maintain eligibility by traveling to the United States once every six months." Dkt. No. 20 at 5. Specifically, the Policy states that a claimant resides outside the United States "when [she] ha[s] been outside the United States or Canada for a total period of 6 months or more during any 12 consecutive months of benefits." Dkt. No. 15 at 293 (AR 293). Archer reads the Policy as permitting residency as long as the claimant does not stay outside the United States "for a total period of 6 *consecutive* months." That is not the language the parties chose, nor is the Policy language ambiguous on this point. Regardless, under either interpretation, Archer's entitlement to benefits had ended by the time she informed Unum of her residency in October 2020.

[5] In *Mull v. Motion Picture Indus. Health Plan*, the Ninth Circuit noted that "[o]ne peculiarity" of the type of argument Archer raises is that "illegality, impossibility of performance, and unconscionability are typically raised as affirmative defenses by the party being sued on a contract." 41 F.4th 1120, 1129 n.7 (9th Cir. 2022). "Here, however, [Archer is] asserting these doctrines in [her] capacity as *plaintiff*[]." *Id.* Like the plaintiffs in *Mull*, Archer does not address this wrinkle. Nevertheless, the Court notes that under Section 502(a)(1)(B), "[r]elief may take the form of a declaratory judgment on entitlement to benefits," and "assume[s] without deciding that a plaintiff seeking declaratory relief under § 502(a)(1)(B) may do the same." *Id.* (citation modified); *see also* Dkt. No. 1 at 10 (Archer's prayer for relief

1    impossibility of performance is applicable in this context, *see Mull*, 41 F.4th at 1130, Archer has

2    not demonstrated that her compliance would have been impossible. For instance, she argues that,

3    "[a]s a practical matter, for much of the period [she] was out of the U.S., it was actually impossible

4    for her to return" to the United States because the border between the United States and Mexico

5    was "closed to 'non-essential travel' for over 19 months." Dkt. No. 16 at 12; *see also id.* at 14

6    ("Even if she wanted to, she could not have driven across the U.S.-Mexico land border during this

7    time, and flights were difficult, if not impossible, to obtain."). However, "[c]itizens and lawful

8    permanent residents returning to the United States," such as Archer, were considered "essential"

9    travelers. Notification of Temporary Travel Restrictions Applicable to Land Ports of Entry and

10   Ferries Service Between the United States and Mexico, 85 Fed. Reg. 16547, 16548 (Mar. 24, 2020)

11   ("travel through the land ports of entry and ferry terminals along the United States-Mexico border

12   shall be limited to 'essential travel,' which includes . . . U.S. citizens and lawful permanent

13   residents returning to the United States"); *see also* Department of Homeland Security, *Fact Sheet:*

14   *DHS Measures on the Border to Limit the Further Spread of Coronavirus* (2020),

15   https://www.dhs.gov/archive/news/2020/10/19/fact-sheet-dhs-measures-border-limit-further-

16   spread-coronavirus (describing measures to limit non-essential travel between Mexico and the

17   United States in 2020 and noting that "U.S. citizens, lawful permanent residents and certain other

18   travelers are exempt from this action"); *Travel Restrictions – Fact Sheet*, U.S. Embassy &

19   Consulates in Mexico (July 21, 2021), https://mx.usembassy.gov/travel-restrictions-fact-sheet/;

20   Dkt. No. 17 at 7.

21        10.    Moreover, Archer's framing of the international residency provision as a quasi-

22   prohibition on international travel is unpersuasive. *See, e.g.*, Dkt. No. 16 at 14; Dkt. No. 18 at 6–

23

24   requesting a finding in her favor and "[a]n [o]rder requiring [Unum] to pay continuing benefits into the future, so long
     as [she] remains disabled under the terms of the Plan").

7. The provision states that beneficiaries will become ineligible for ongoing LTD benefits once they are outside the United States or Canada for more than six total months during a 12-month period; it does not prohibit them from traveling internationally. Dkt. No. 15 at 293 (AR 293). Archer made Mexico her primary residence in October 2019. *See* Dkt. No. 15-1 at 93 (AR 1093). "[I]t cannot be said that the non-occurrence of [her moving to Mexico] was a basic assumption on which the contract was made, for the Plan itself anticipates the possibility of such an event" by virtue of the international residency provision. *Mull*, 41 F.4th at 1131 (citation modified). Under the Policy, it was Archer's responsibility to reside in the United States for at least six months between October 2019 and October 2020. This she did not do.

11.    Instead, the record shows that Archer intended to do the opposite. She stated that she moved to Mexico on October 13, 2019 with the intent of making it her primary residence for eight months per year. Dkt. No. 15-1 at 93 ("I am currently living in Mexico. . . . My plan was to stay in Mexico 8 months a year and go to Oregon 4 months a year."); Dkt. No. 15-2 at 301, 428. Archer was in the United States for six days in January 2020, Dkt. No. 15-1 at 693; *see also* Dkt. No. 15-2 at 298, 432, so she would have had to return to the United States by April 12, 2020 and resided there continuously until October 12, 2020 to be in the United States for more than 50 percent of the time for that one-year period. But Archer's planned return trip to the United States in April 2020 was only temporary; she planned to participate in medical appointments and return to Mexico. Dkt. No. 15-1 at 93; Dkt. No. 15-2 at 311; Dkt. No. 16 at 4. So even if her April 2020 flights had not been canceled due to COVID-19, Archer would have exceeded six months in Mexico by that month. By any measure, Archer concedes that she did not plan to spend over six months in the United States between October 13, 2019 and October 12, 2020.

12.    Furthermore, Archer's medical safety argument is unsupported. *See* Dkt. No. 16 at 14–15. As an initial matter, the Policy does not *require* the sort of back-and-forth travel Archer

describes. For example, Archer argues that "Unum expected Archer to undertake international travel during the height of the COVID-19 pandemic, an action which – if not impossible – would certainly have involved significant medical risks." Dkt. No. 18 at 4–5. But, as Unum notes, the Policy did "not require [Archer] to travel between Mexico and the United States in 2020 or at any time," and "[t]he fact that [Archer] may have believed it would be unsafe for her to travel does not provide a legal basis to ignore the Policy's residency provision." Dkt. No. 17 at 6, 8. Moreover, Archer does not provide evidentiary support for her arguments regarding the medical risks posed to her by travel (by air, car, or other means) during the COVID-19 pandemic. And although she claims that "it would have been medically inadvisable" for her to travel during 2020, she cites only to her own statements about the conditions she allegedly suffered from during this period, Dkt. No. 16 at 14 (citing AR 1093–94), and does not connect the dots between those conditions and any medical advice or medical opinion regarding whether travel would be safe for her during this period of time. Indeed, Archer was able to move to a new residence in Mexico in May 2020 despite the pandemic, and she also traveled to the United States from February 20, 2021 to March 7, 2021, Dkt. No. 15-2 at 424, *before* she received a COVID vaccine, and again from April 5, 2021 to May 5, 2021, *id.*, when she obtained the vaccine, Dkt. No. 15-2 at 311.

13.    For these reasons, the Court declines to waive Archer's noncompliance with the Policy based on her assertion of impossibility. *Id.*; *cf. US Airways*, 569 U.S. at 98 (equitable principles are "beside the point when parties demand what they bargained for in a valid agreement" (quotation marks and citation omitted)).

(b)    Archer Has Not Shown that the International Residency Provision Should be Waived

14.    Last, Archer argues that the international residency provision should be waived because, under a different plan, Unum approved an appeal for a claimant whose benefits were

terminated pursuant to the same policy language after she remained outside the United States for more than six months. Dkt. No. 16 at 15–16; Dkt. No. 18 at 7–11; *see* Dkt. No. 16-1 (appeal documents from claimant who purportedly remained in Aruba between late January 2020 and October 10, 2020).[6] Assuming without deciding the Court may consider this evidence, which is not authenticated or contained in the administrative record, the Court finds Archer's argument to be without merit.

15.    Archer contends that Unum did not maintain internal guidance on how to apply the international residency provision during the COVID-19 pandemic, and as a result, "[i]n at least these two cases, and presumably in many others, this . . . led to disparate results for similarly situated claimants[.]" Dkt. No. 16 at 16; *see also* Dkt. No. 16-2 (Unum's discovery responses related to internal guidance on "pandemic travel"); Dkt. No. 18 at 10–11. However, Archer's argument is wholly speculative. And she cites no legal authority supporting her contention that the same policy language administered under two different plans can bear on the determination of whether Unum's "plan provisions have been applied consistently with respect to similarly situated claimants" under 29 C.F.R. § 2560.503–1(b)(5), or any other relevant regulation. Nor does she support her claim that two different outcomes under the same policy language can, as a matter of law, violate the requirement that plans "establish and maintain reasonable procedures governing the filing of benefit claims, notification of benefit determinations, and appeal of adverse benefit determinations[.]" *Id.* The mere fact that Unum determined that Archer was ineligible but that

---

[6] In her motion, Archer also cites to Department of Labor ("DOL") guidance in support of her request that the Court "enforce the leniency recommended by the DOL, and reinstate her benefits." Dkt. No. 16 at 9–10 (citing Employee Extension of Certain Timeframes for Employee Benefit Plans, Participants, and Beneficiaries Affected by the COVID-19 Outbreak, 85 Fed. Reg. 26351 (May 4, 2021); Empl. Benefits Sec. Admin., EBSA Disaster Relief Notice 2021-01, https://www.dol.gov/agencies/ebsa/employers-and-advisers/plan-administration-and-compliance/disaster-relief/ebsa-disaster-relief-notice-2021-01 (last visited July 24, 2025)). However, Unum points out that this guidance does not apply to her claims, Dkt. No. 17 at 5, and the Court agrees, *cf. Solze v. United of Omaha Life Ins. Co.*, No. 21-CV-1139-WJM-NYW, 2022 WL 618029, at *2–3 (D. Colo. Feb. 7, 2022). In addition, it appears that on reply, Archer abandoned her arguments based on such DOL guidance. Dkt. No. 20 at 2 n.2; *see also generally* Dkt. No. 18.

1    another claimant remained eligible pursuant to a different plan and a different set of circumstances

2    does not entitle Archer to judgment on the record.

3          16.    The cases Archer cites are not to the contrary. Dkt. No. 18 at 8–9. In *Stephan v.*

4    *Unum Life Insurance Company of America*, the Ninth Circuit took issue with Unum's

5    interpretation of certain plan language based on how such an interpretation would impact other

6    plan participants within the same plan. 697 F.3d 917, 935–36 (9th Cir. 2012). That is not the case

7    here, where Unum's interpretation of the international residency provision language appears

8    consistent, and does not affect claimants within the same plan. Likewise, in *Cannon v. UNUM Life*

9    *Insurance Company of America*—which is not binding on this Court—the district court held that

10   the plaintiff was entitled to discover Unum's "administrative precedents" informing "its

11   consideration of benefit claims . . . premised on disabilities giving rise to dementia," and stated in

12   dicta that "Unum owes fiduciary obligations" along the lines of disclosing internal administrative

13   precedents that "should inform" its decisions in similar cases. 219 F.R.D. 211, 216–17 (D. Me.

14   2004) (citing 29 C.F.R. § 2560.503–1(b)(5)); *see also id.* at 214 ("Obviously, if Unum has internal

15   memoranda or policies that instruct claim handlers how to apply the mental illness limitation, such

16   materials are relevant to the question of whether Unum acted arbitrarily and capriciously in

17   connection with its denial of [plaintiff]'s claim."). Here, Archer sought such discovery from Unum,

18   and she did not move to compel any additional discovery after Unum represented that such

19   documentation did not exist. *See* Dkt. No. 16-2. Without more, the Court is unable to conclude

20   that Unum acted arbitrarily and capriciously in Archer's case.

21         17.    Thus, upon an independent and thorough inspection of Unum's decision, the Court

22   finds that Unum properly terminated Archer's continuing LTD benefits based on the plain

23   language of the Policy as applied to the undisputed facts of this case. The Court does not reach the

24   issue of the appropriate termination date; supplemental briefing is required on that topic.

1

2

**C.      Unum's Failure to Warn Archer of the Policy's International Residency Provision Does not Warrant Reinstatement of Archer's Benefits as an Equitable Remedy**

3

18.      Under Section 502(a)(3), an ERISA plan participant or beneficiary may bring a

4

civil action "(A) to enjoin any act or practice which violates any provision of this subchapter or

5

the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations

6

or (ii) to enforce any provisions of this subchapter or the terms of the plan[.]" 29 U.S.C.

7

§ 1132(a)(3). Claims brought under this section do not "authorize appropriate equitable relief at

8

large," but rather, the statutory language "countenances only such relief as will enforce the terms

9

of the plan or the statute." *US Airways*, 569 U.S. at 100 (citation modified). Such limitation

10

"reflects ERISA's principal function: to 'protect contractually defined benefits.'" *Id.* (quoting

11

*Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 148 (1985)).

12

19.      In addition, ERISA "imposes the following duties on plan fiduciaries: the duty of

13

loyalty, the duty of prudence, the duty to diversify the investments, and the duty to act in

14

accordance with the documents and instruments governing the plan." *Terraza v. Safeway Inc.*, 241

15

F. Supp. 3d 1057, 1069 (N.D. Cal. 2017) (citing 29 U.S.C. § 1104(a)(1)). To prevail on a claim

16

for breach of fiduciary duty under ERISA, a plaintiff must show that (1) the defendant was a

17

fiduciary; (2) the defendant breached a fiduciary duty; and (3) the plaintiff suffered damages.

18

*Bafford v. Northrop Grumman Corp.*, 994 F.3d 1020, 1026 (9th Cir. 2021) (citing 29 U.S.C.

19

§ 1109(a); *Mathews v. Chevron Corp.*, 362 F.3d 1172, 1178 (9th Cir. 2004)); *see also Morris v.*

20

*Aetna Life Ins. Co.*, No. 21-56169, 2023 WL 3773656, at *1 (9th Cir. June 2, 2023).

21

20.      As relevant here, Archer alleges that she is entitled to equitable relief pursuant to

22

Section 502(a)(3) because Unum breached its fiduciary duty by failing to warn her about the

23

Policy's international residency provision or regularly request information from her about her

24

residency. Dkt. No. 16 at 16–19; Dkt. No. 18 at 12–14; *see* Dkt. No. 1 at 8–9. Archer maintains

1    that "[t]he fiduciary duty of loyalty includes a duty to inform claimants of plan provisions which

2    would be relevant to their circumstances." Dkt. No. 16 at 8; *see also id.* at 19 ("Unum failed in its

3    duty of loyalty to Archer by failing to warn her of the plan's out-of-country clause at the outset of

4    her claim, during her claim, or even at a reasonable time after it learned of her international

5    travel."). Archer further argues that she "was unaware of this policy provision, and was not asked

6    to inform Unum about her international travel." *Id.* at 12; *see also* Dkt. No. 1 at 4 ("Plaintiff was

7    unaware of the Plan's international travel requirements").

8        21.    As an initial matter, plan participants who have been provided with a summary plan

9    description have constructive knowledge of the contents of such document. *See Scharff v.*

10   *Raytheon Co. Short Term Disability Plan*, 581 F.3d 899, 908 (9th Cir. 2009) ("To require plan

11   administrators within the Ninth Circuit to inform participants separately of time limits already

12   contained in the SPD, when other circuits have rejected a similar rule, would place the Ninth

13   Circuit out of line with current federal common law and would inject a lack of uniformity into

14   ERISA law."). Even crediting Archer's plausible but unsupported assertion that she was

15   subjectively unaware of the international residency provision, she does not assert that Unum failed

16   to provide her with the relevant Plan or Policy documents in the first instance. *Testa v. Becker*, No.

17   CV10638GHKFMOX, 2010 WL 1644883, at *5 n.3 (C.D. Cal. Apr. 22, 2010) ("Plaintiff does not

18   state in his Opposition that he failed to receive a copy of the August 2008 SPD. . . . In this context

19   and in the absence of any affidavit from Plaintiff himself declaring he never received the SPD, we

20   take Plaintiff's statement that he 'had no notice' to mean that he failed to read the SPD upon

21   receipt. His failure to do so does not undermine the notice that was afforded him."). And the Policy

22   language regarding when a beneficiary is considered to reside outside the United States is

23   conspicuous, plain, and clear. This provision is logically included in the "LONG TERM

24   DISABILITY BENEFIT INFORMATION" section of the Policy. Dkt. No. 15 at 281. In the same

font as the preceding headings, its heading reads "*WHEN WILL PAYMENTS STOP?*" *Id.* at 293. It then states: "We will stop sending you payments and your claim will end on the earliest of the following: . . . after 12 months of payments if you are considered to reside outside the United States or Canada. You will be considered to reside outside these countries when you have been outside the United States or Canada for a total period of 6 months or more during any 12 consecutive months of benefits." A person of average intelligence and experience would easily understand this international residency provision to mean that a beneficiary will be considered to reside outside in the United States or Canada if he or she is outside those countries for a total of 183 days or more (i.e., more than 50 percent of the time) in any given one-year period. *See Harlick v. Blue Shield of California*, 686 F.3d 699, 709 (9th Cir. 2012) (upholding plan exclusion that a person "of average intelligence and experience" would have no trouble understanding); *Arnold v. Arrow Transp. Co. of Delaware*, 926 F.2d 782, 786 (9th Cir. 1991). It is no excuse that Archer failed to read the language until it was too late. *See Hall v. Life Ins. Co. of N. Am.*, 317 F.3d 773, 776 (7th Cir. 2003) (affirming summary judgment to disability carrier where beneficiary "did not read the . . . policy at all until it was too late"; "ERISA does not protect employees against their own imprudence").

22.    Archer also does not argue that Unum's provision regarding repayment of claims was not provided to her or is ambiguous. This provision is logically included in the "CLAIM INFORMATION; LONG TERM DISABILITY" section of the Policy. Dkt. No. 15 at 270–71. In the same font as the preceding headings, its heading reads "*WHAT HAPPENS IF UNUM OVERPAYS YOUR CLAIM?*" *Id.* at 271. It then states:

> Unum has the right to recover any overpayments due to:
>
>     - fraud;
>
>     - any error Unum makes in processing a claim; and
>
>     - your receipt of deductible sources of income.

1    You must reimburse us in full. We will determine the method by which the
2    repayment is to be made.

        Unum will not recover more money than the amount we paid you.

3    *Id.* A person of average intelligence and experience could easily understand that pursuant to this

4    provision, Unum could recover any overpayments due to fraud or any error it made in processing

5    a claim, and that such fraud or error could be related to provisions regarding when Unum would

6    cease making payments, including the international residency provision. *See Harlick*, 686 F.3d at

7    709; *Arnold*, 926 F.2d at 786.

8        23.    For the foregoing reasons, the Court concludes that Archer had constructive notice

9    of the provisions at issue. *See, e.g.*, *Nathaniel W. v. United Behav. Health*, No. 17-CV-06341-PJH,

10   2018 WL 3585180, at *6 (N.D. Cal. July 26, 2018).

11       24.    Importantly, as Unum notes, by the time Archer informed Unum in October 2020

12   that she had been living in Mexico since October 2019, she had already violated the Policy's

13   international residency provision, so "it would have been futile for Unum to 'warn' [Archer] of

14   the residency requirement" at that point because she "was already ineligible for benefits" by then.

15   Dkt. No. 17 at 9; *see also* Dkt. No. 20 at 8 (same). Likewise, although Archer argues that Unum's

16   18-month "delay in enforcement . . . should be taken as further evidence of Unum's ambivalence

17   towards enforcement of this policy provision," Dkt. No. 16 at 17–18, this does not support her

18   claim that Unum breached its fiduciary duty or that she is entitled to relief under the Policy

19   pursuant to Section 502(a)(3). As she notes, she submitted her Mexico residency information to

20   Unum in a "generic questionnaire requesting 'information about your condition.'" Dkt. No. 16 at

21   17 (citing Dkt. No. 15-1 at 93 (AR 1093)). And Archer cites no law supporting her suggestion that

22   a delay in enforcement constitutes a breach of fiduciary duty or can otherwise waive enforcement.

23

24

25.     Archer's citation to *Krohn v. Huron Memorial Hospital*, 173 F.3d 542 (6th Cir. 1999) and *Chappel v. Laboratory Corporation of America*, 232 F.3d 719 (9th Cir. 2000) are inapposite. *See* Dkt. No. 18 at 12–13. In *Krohn*, the court found that an ERISA plan administrator breached its fiduciary duty by failing to provide pertinent information about a claimant's entitlement to LTD benefits when her husband asked for information about benefits to which she was entitled. 173 F.3d at 546–51. Here, Archer points to nothing in the record suggesting that she requested any information from Unum related to the international residency provision in connection with her decision to move to Mexico, or that Unum failed to affirmatively inform her about the provision when it could have made a difference to her eligibility. There is no freestanding obligation on the part of the fiduciary "to seek out [beneficiaries] to ensure that they understand the plan's provisions[.]" *Electro-Mech. Corp. v. Ogan*, 9 F.3d 445, 452 (6th Cir. 1993); *Barrs v. Lockheed Martin Corp.*, 287 F.3d 202, 207–08 (1st Cir. 2002) ("Absent a promise or misrepresentation, the courts have almost uniformly rejected claims by plan participants or beneficiaries that an ERISA administrator has to volunteer individualized information taking account of their peculiar circumstances."); *Chojnacki v. Georgia-Pac. Corp.*, 108 F.3d 810, 817–18 (7th Cir. 1997) ("ERISA does not require plan administrators to investigate each participant's circumstances and prepare advisory opinions for literally thousands of employees."). Similarly, in *Chappel*, the Ninth Circuit reversed a district court's denial of the plaintiff's motion for leave to amend, holding that the plaintiff could state a claim that the plan administrator breached its fiduciary duty when it denied his appeal and failed to expressly inform him of the 60-day deadline for initiating mandatory arbitration. 232 F.3d at 725–27. Notwithstanding the different procedural posture, the Court finds that a fiduciary's failure to inform a claimant about a time-limited mandatory arbitration deadline that it knows or should know is relevant to a claimant's appeal is

1   not the same as a claimant living abroad beyond what her policy allows and then faulting the

2   fiduciary after the fact for failing to warn her of the relevant provision.

3         26.     Thus, Archer is not entitled to equitable relief under Section 502(a)(3) based on

4   Unum's alleged breach of fiduciary duty.

5   **IV.  SUPPLEMENTAL BRIEFING REGARDING UNUM'S COUNTERCLAIM**

6         Unum has requested that, in the event the Court agrees with Unum that Archer is no longer

7   eligible for ongoing LTD benefits, that it entertain further briefing with respect to the overpayment

8   issue Unum raised in its counterclaim. Dkt. No. 17 at 10; *see also id.* at 3 n.1 ("Unum does not ask

9   the Court to rule on the overpayment issue in connection with these cross-motions."); Dkt. No. 17-

10   1 at 1; Dkt. No. 20 at 1 n.1. Specifically, Unum seeks repayment of $62,893.14 in benefits paid

11   from April 20, 2020 through April 27, 2022. Dkt. No. 17 at 3.

12         Unum asserts that "claimants will become ineligible for ongoing benefits if they reside

13   outside the United States or Canada for 'a total period of 6 months or more during any 12

14   consecutive months,'" Dkt. No. 17 at 1, making Archer ineligible (and obligated to repay

15   subsequent overpayments) as of April 20, 2020, *id.* at 3. What the Policy language actually says is

16   that Unum "will stop sending [the beneficiary] payments and [her] claim will end. . . . *after 12*

17   *months of payments* if [she is] considered to reside outside the United States or Canada." Dkt. No.

18   15 at 293 (AR 293) (emphasis added). As discussed above, a beneficiary "will be considered to

19   reside outside these countries when [she] ha[s] been outside the United States or Canada for a total

20   period of 6 months or more during any 12 consecutive months of benefits[.]" *Id.* The parties did

21   not address the meaning of the language regarding the timing of payment cessation in their briefs.

22   *See generally* Dkt. Nos. 16–18, 20. This language appears to be susceptible to at least two

23   reasonable interpretations:

24

- The beneficiary's claim will end after 12 months of payments *once* the beneficiary is considered to reside outside the United States or Canada, i.e., after a beneficiary has spent more than half a year in another country, payments will continue for 12 months thereafter; or

- If the beneficiary has received 12 months of payments, Unum will stop paying them as soon as the beneficiary is considered to reside outside the United States or Canada, regardless of the timing of when the beneficiary reaches "outside residence" status.

*See Spaulding v. Sessions*, 751 F. App'x 130, 133 (2d Cir. 2018) (the word "if" is "commonly used to introduce a conditional clause"); *Anderson v. United States*, 147 Fed. Cl. 661, 678 (Ct. Fed. Cl. 2020) (word "if" "usually signals a condition subsequent"); *If*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/if (last visited July 28, 2025) (defining "if" as "in the event that" and "on condition that").

The doctrine of *contra proferentem*—which applies to the Policy here—holds that "if, after applying the normal principles of contractual construction, the insurance contract is fairly susceptible of two different interpretations, another rule of construction will be applied: the interpretation that is most favorable to the insured will be adopted." *Blankenship v. Liberty Life Assur. Co. of Bos.*, 486 F.3d 620, 625 (9th Cir. 2007) (quoting *Kunin v. Benefit Tr. Life Ins. Co.*, 910 F.2d 534, 540 (9th Cir. 1990)). In addition, as discussed above, 29 C.F.R. § 2560.503–1(b)(5) requires that "claims procedures contain administrative processes and safeguards designed to ensure and to verify that . . . , where appropriate, the plan provisions have been applied consistently with respect to similarly situated claimants." Under Unum's reading of the payment timing provision, it appears that, for example, Beneficiary A—who started receiving benefits for the first time in September 2019 and then moved to Mexico permanently in October 2019—would receive payments for 12 months until September 2020. But Beneficiary B—who started receiving benefits

for the first time in September 2013 and then moved to Mexico permanently in October 2019—would receive payments only until April 2020. In other words, Beneficiary A would receive 11 months of benefits after moving to Mexico, and Beneficiary B would receive six months of benefits after moving to Mexico.

Within 21 days of the date of this Order, the parties are directed to meet and confer and file a joint proposed briefing schedule for resolving Unum's counterclaim related to overpayment. In the parties' briefs, they should address (1) the amount of repayment Archer owes given the Court's conclusion that Archer was considered to reside outside the United States and Canada as of April 12, 2020, *see supra* Conclusion of Law 11; (2) whether the language regarding the timing of payment cessation is ambiguous and therefore should be construed to have the meaning most favorable to the beneficiary, i.e., that once a beneficiary has spent more than half a year in another country, payments will continue for 12 months thereafter; (3) whether 29 C.F.R. § 2560.503–1(b)(5) should have any bearing on the resolution of the overpayment issue here. Because the Court is already familiar with the record, the parties need not include background facts in their briefs.

## V.    CONCLUSION

For the foregoing reasons, the Court DENIES Archer's motion for judgment on the record, Dkt. No. 16, and GRANTS Unum's cross-motion for partial judgment on the record, Dkt. No. 17. Within 21 days of the date of this Order, the parties are directed to meet and confer regarding Unum's claim for overpayment and, if necessary, submit a joint proposed briefing schedule. However, the Court encourages the parties to work to resolve this issue without court intervention. If nothing is filed within 21 days, the Court will direct the Clerk of Court to close this matter.

Dated this 28th day of July, 2025.

Lauren King
United States District Judge